The centerpiece of this present appeal is an agreement which our client Mr. Craig Cunningham entered into with the government in November 1998. To make a very quick synopsis, in August 1998, the U.S. Attorney's Office for the Northern District of Ohio, operating as part of a joint task force with the SEC, the CFTC, and the U.S. Attorney's Office, filed a mail fraud action against Mr. Cunningham. Over $6.3 million was seized by Mr. Cunningham. Thereafter, in November 1998, the government, through the U.S. Attorney's Office, entered into a settlement with Mr. Cunningham and other defendants, including CTI, a company owned by Mr. Cunningham and the main subject of the SEC action. The word agencies was utilized throughout the agreement. Paragraph 13 referenced the U.S. and its agencies. Paragraph 25 referenced the CTI restoration fund to pay claims on behalf of any federal government agency seeking compensation on behalf of CTI customers, and other paragraphs were the same. The agreement was also put in the form of a court order, which was executed by the Northern District of Ohio. And paragraph 5 of that court order also referenced a government claim against CTI as one made by an agency. Paragraph 25G contained provisions for the payment of government claims against the CTI restoration fund. Notwithstanding, in 2000, the SEC filed its present action, asking for an injunction, penalties, and disgorgement. The court thereafter obtained supplemental declarations from the draftsman of the agreement, Mr. Siegel, the he had told the SEC about the agreement when it was being executed. Ms. Murphy stated that she was asked to participate, said she would not. And Ms. Murphy also stated somewhere, or Mr. Siegel stated in his declaration that he was told that Ms. Murphy said the agreement was secret and not to reference it. In terms of the appeal here, there are, I believe, three separate interrelated groups of issues. One, the government has claimed that the 1998 Ohio settlement only restricted subsequent forfeiture actions, and then it has said that since this disgorgement is not encompassed within the concept of forfeiture, the agreement does not apply. It also has said, as a sub-part of that, that since it contained an exception for restitution, the present action for a disgorgement, again, is inapplicable. Second, the government has said that the U.S. Attorney's Office did not have authority to subsequently bind the SEC, and as such, the agreement could safely be ignored. Third, the SEC has held that there should not be an offset because the agreements were not appropriately raised in the district court. Two of these issues were, in my judgment, carefully raised in our briefs. The offset issue was raised. The matter had been raised fairly often in our – the matter had been raised in the district court in the declarations of Mr. Edgerton and otherwise. Counsel, I have a question about the offset issue. Yes. And for the sake of this question, I'd like you to assume that the disgorgement action can go forward because otherwise there's no offset happening. It seems to me that at least theoretically, restitution and disgorgement together could result in more than 100 percent of the losses having to be paid because disgorgement can go for things other than restitution amounts. Do you agree with that? Yes. Yes, I do. Disgorgement can go just to U.S. Treasury. Goodbye. And so in this case, you are asking for an offset of what amounts and for what reason? In this case, we would – there are two issues, Your Honor. One, if the court would agree to us that the SEC action for disgorgement is barred, then obviously the whole – the judgment on remand would be reversed as to disgorgement. Assuming it doesn't go that far, we would ask for disgorgement in the amount that was seized by Mr. Cunningham – from Mr. Cunningham, which was $6.3 million, less amounts paid by Mr. – for Mr. Cunningham's taxes and some personal figures. I believe in our brief, Your Honor, we referenced that that amount would come up to something in the neighborhood of $4,100,000 or $200,000 under the – I believe a calculation made in our opening brief. The sum total of disgorgement under that kind of offset would amount to about $172,000 as we calculated it. These funds, Your Honor, were set forth with some specificity in the 1998 agreement which was – which was executed between the parties. I don't know if that answers the court's question or if I'm missing something here. Well, I think I understand your position. I'm just trying to figure out how – whether that's something that we would calculate or the district court would calculate, assuming that, for the sake of the question, assuming that we were to hold that the disgorgement action was not barred by the previous settlement agreement. I believe, Your Honor, under those circumstances it would be a matter appropriate for remand to the district court. It might be a simple hearing there, but I felt that the disgorgement could be calculated by this court on the basis of the stipulated facts set forth in the 1998 agreement. But – Yeah, the basic theory of disgorgement, as I understand it, is that it's to require the defendant to give back the ill-gotten gains, whatever they are. That's correct, Your Honor. That's exactly – Okay. All right. Let me ask you a little different question. Would you agree that the settlement agreement culminated from actions taken pursuant to 18 U.S. Code Sections 981 and 982? Yes, I would. And then does it make any difference that the action brought by the SEC was under a different statute, 15 U.S.C. Section 77T? Does that make any difference? No, because the settlement agreement, Your Honor, is we could – there are two answers to that. The first one is no, because the settlement agreement purported to bind the U.S. and all of its agencies. And if that wording is to mean anything, it had to mean agencies which perforce would be bringing causes of action other than those which the U.S. attorney brought. Moreover, you have to look at the tight wording of the I think there are two paragraphs in the agreement. The first one says any claims brought under 18 U.S.C. 1345, which by reference referenced 981 and 982. The second part, and I believe it's paragraph 41B of the agreement, referenced any claim seeking disgorgement. And that would suggest to me, if we're following the careful wording of the agreement, that what the government is really saying in the agreement is we release anything involving a cause of action which would subsequently call for the remedy of disgorgement. So I think it goes Which paragraph of the agreement are you relying on? If I could, Your Honor, for just a moment. That would be For some reason, yes, 41A and 41B, Your Honor. And it's 41B that states that any claim seeking civil forfeiture of assets. You said disgorgement earlier. Yes, you did. That's why I was asking the question exactly. Yeah. It does not say disgorgement. No, it does not. And our position, Your Honor, very succinctly, is the following. Disgorgement is simply, it can't be construed as the SEC says. It is a term which in substance means the forfeiture of, the giving away of assets without compensation. The district court did not rely heavily upon that argument, Your Honor. But the point is, and the SEC in its brief said, disgorgement cannot be the same as forfeiture because forfeiture is punitive whereas disgorgement is remedial. In fact, Your Honor, that is simply not the case. We cited cases involving Themis v. Michigan and U.S. v. Usury where the Supreme Court held that forfeiture is in fact a remedial as opposed to a punitive concept. All these are terms of art, though, aren't they? I mean, in common parlance, a person passing on the street might view restitution, disgorgement, forfeiture as all being more or less interchangeable. But aren't those terms of art in this world that we're dealing with? And shouldn't we view each of those as being separate so that if disgorgement is not disgorgement is in fact, or how would I put it, forfeiture particularly has a thousand year history in the common law. And even the SEC and SEC v. Ryan noted that disgorgement remedial and what I come to is the non-punitive aspect of Justice Story, which really illustrates the point well. And it's cited in Holmes' The Common Law, which unfortunately we didn't put in our brief. And Justice Story just made the point that if my horse strike a man and afterwards I sell my horse and after that the man dies, the horse shall be forfeited. I mean, that clearly from Justice Story's point of view illustrated the non-punitive aspect of this. Counsel, I'm not sure how that helps you because in paragraph 51 restitution, which is also equitable and non-punitive, is specifically allowed to continue. So I'm not sure how that helps to just say what is not punitive. I'm not sure how that helps to just say what is not punitive.    And that would not, so the SEC cannot say in a series of cases as we cited, that restitution here is the same thing as disgorgement. And then in the cases that we cited, say the reversal honor. I don't believe that would be appropriate. Counsel, what is your best case authority for the position that the SEC was bound by the U.S. Attorney General? The best case authority we would have on that, Your Honor, would be two, would be three cases. Just give me your absolute best case for that. Okay. Boshar v. Sinar, Your Honor, 478 U.S. 714. And if I also might add, there's the Morrison case, Your Honor, 487 U.S. at 686. And both of those hold for the same principle, Your Honor, which is namely that once the, once an agency which Congress has set up begins to assume certain functions, they're assuming the government, the executive function. And once we're assuming the executive function, Your Honor, then at that particular point in time, we have an Article II problem. Were those cases cited in your brief, Counsel? The Morrison case is cited very much, Your Honor, yes. And INS v. Charter is cited in our brief, yes. Thank you. Okay. May I? I think I have four minutes. No, you have four seconds. I might have one. We'll give you a minute for rebuttal on the time. Thank you, Your Honor. I believe with that I'll come. Thank you. We'll hear now from the SEC. Good morning, Your Honors. My name is Leslie Smith and I represent the Securities and Exchange Commission. The Commission, as you know, in this action, obtained a disgorgement judgment of $4.3 million against Defendant Cunningham, which was his individual share of the ill-gotten gains to be obtained from investors in his company's CTI. This disgorgement judgment is not prohibited or cut down by the settlement agreement that the defendants signed with the U.S. Attorney in the Northern District of Ohio. First, because the settlement agreement covers government-type forfeiture claims that do not include the Commission's remedy of disgorgement. The key provision in the settlement agreement is 41B, which provides that the United States agrees not to bring any claims seeking civil or criminal forfeiture based on certain conduct involving foreign currency options, quote, as the offense conduct or specified unlawful activity giving rise to the government's entitlement to forfeiture. And maybe this just reveals my confusion, but I also think it goes to the offset issue, which is, is there some quantity of assets that was forfeited through this settlement agreement that overlaps with what the court below has just ordered disgorged? Is there some quantifiable overlap there? I think there might be a tiny overlap, because there were restitution actions to CTI customers, but nothing else. What happened was that the Department of Justice seized $12.7 million from bank accounts. The 6-point-something were Cunningham's, 5-point-something were Moore's, and the rest from the other defendants. And then out of the seized money, it paid $5.1 million to the options trading group investors. They were fully paid off. Then it paid off the things that my opposite counsel mentioned, the taxes and the $600,000 payment to Cunningham for his personal use. And in the end, there was $2.1 million left over, and they all decided, well, let's put it in a fund for CTI customers. CTI was not a defendant in the case. It was finally brought in as a party three days before the agreement was signed, just to receive and sign notices and things like that. So if there is any overlap, it would be in the 12 claims that have been filed against CTI by disappointed investors. That the commission has made very clear in its brief and its general practice would be credited to Cunningham, because it was paid to investors who were within the discouragement fund of persons defrauded by CTI. So I take it there's some mismatch between the amounts that the government was able to seize and forfeit, and the ill-gotten gains that it has sought in the second action, well, the SEC sought in the second action. No, actually. What it is, is the SEC in the second action went through straight away with a solid disgorgement action, as it would always do. There may have been some persons who would turn out to be includable in that action who filed in this little CTI, you know, it's only like $200,000 that were ever filed under the claims in that fund. So there may be some people who were over there, and they would not be given, of course, a double credit. But the claims that are involved are different, and they were kept separate by the Department of Justice. The OTG claims come from a completely different company in a different time period and in a different options market over which the commission has no jurisdiction. And the claims that are in Ohio are totally different from the claims in the commission's action. Have I answered your question, or do you still have one? No, I don't understand why it wasn't all done together, I guess. Well, the commission knew very little about it. I mean, there was almost no awareness, as you can tell from the record. There was one person who talked a little bit to Siegel, and they obviously misunderstood each other as to what was going on, although Molly Murphy was fairly correct about what was going on. There were arrests, there was criminal action. The SEC would have nothing to do with that. And then he began talking about a settlement, and she apparently thought it was a settlement for OTG, which was true until the last three days or so of the agreement. I mean, it was put in rather late. He was under a lot of pressure to use the funds as well as he could for, you know, restitutionary purposes. And that was the result. Well, but the government conceded in its brief that there should be some offset. Certainly. So wouldn't you think it would be appropriate for the district court judge to determine what that offset would be, rather than for us doing that on appeal? Well, actually, normally it's done by the commission as it moves forward and, you know. But since the judge denied offset, if you – I don't know. Jurisdictionally, I don't know whether you need to go back to the district court to have him say yes to the $220,000 that were CTI claims that were reimbursed or not are to be offset. Is the judge limited to that amount that you articulate here as being appropriate, or can the judge determine that there is some different amount that perhaps should be offset? Well, it's possible, isn't it? I mean, I think – I don't think there is, but it is possible that he would find something in the whole arrangement that would cause him to think a slightly different distribution might be made. The – where was I? On the forfeiture, the key provision speaks of forfeiture all over it and comes from the forfeiture statutes in Title 18. That's what the parties were negotiating about, as Siegel says in his affidavit. They were – the complaint in the OTG action accused them of civil and criminal actions that were subject to forfeiture. His description was, the use of the term forfeiture was intended and resulted from negotiations which expressly used that term as a legal term, namely an action by the government, civilly or criminally, to assert legal title to funds on the basis that they had become forfeit to the government under the law of forfeiture. The defendant did not answer this argument in its reply, and there appears to be nothing in the record to suggest that defendants' counsel should have expected another meaning of forfeiture in that contract. Defendant argues, however, that in interpreting the settlement agreement, contract terms are to be interpreted in their ordinary or popular sense, by which he means the dictionary definition of forfeiture, which is broad enough to allow – to cover disgorgement. But even under the authorities that are cited by the defendant, it is inappropriate to resort to that conclusion. The restatement of contract second 202, which defendant cites, says that in addition to the ordinary meaning that is often used, B is that technical terms of words of art are given their technical meaning when used in a transaction within their technical field. And that rule is followed in Robin v. Sun Oil in order to interpret a term in a contract that was used by contracting parties who were lawyers. The technical meaning of forfeiture is the correct meaning of that word in the settlement agreement. Forfeiture is a remedy that has been associated with punishment, whereas disgorgement is an equitable remedy designed to recover a defendant's ill-gotten gain. What difference does that make to either side? If the parties meant strictly the statutory forfeiture claims were being released, why does it matter how we characterize them as long as their intention was limited to those statutory claims and this is a different statutory claim? I mean, both parties have argued that at great length, but it seems to me that if they had in mind statutory claims 1 and 2 but not 3, 4, and 5, why do we have to analyze what the underlying philosophy is of those claims? Well, when we you we described the disgorgement has historically been called not a forfeiture by the courts because if they say, oh, yes, it is a forfeiture, you at least have a legal backup to say, actually, that's not true. It's not that kind of remedy. Now, I'm wondering, you wanted... Well, the settlement agreement, part of your argument has been that the settlement agreement was brought under sections 981 and 982, and that's all that was intended to be settled. And when the parties used the term forfeiture, they meant certain statutory claims. And you say, where's something else? We're bringing a different claim that isn't called that in the statute. And I guess I don't understand why we would have to go beyond that to characterize the different kinds of claims. Well, obviously, if you decided it on the face of the statute that forfeiture was forfeiture and disgorgement wasn't it, you wouldn't have to go beyond it. I think that's a supplementary argument that for many years of history, when courts were confronted with this very question, they said, no, you don't put disgorgement in a class with forfeiture, mainly because you can only take the ill-gotten gains. I mean, all the cases remind us that disgorgement is not to be used as a punishment nor is it punitive. You know, you'll get stopped in the court of appeals if you make a mistake and take more than the ill-gotten gains. And forfeiture, under civil and criminal forfeiture, you're entitled to seize the proceeds or any homes, cars, whatever. Right. Beyond that, so you can go way beyond the ill-gotten gains. And they seized cars here. Moore had three Jaguars that they seized. Why did you seize it all in the first place and what's left? I mean, if you add up all the orders of how much money he had. I think they did the best they could. They grabbed at the money because this company, OTG, operated in the unregulated options market, so nobody was paying any attention to it. And the Department of Justice decided, we're going to get these people, they're committing crimes, and went off and got what they got. But I don't think they could have exactly pictured, well, let's take this many cars or this many dollars, because they didn't know what the claims were going to be. At least that's, I don't, I've never been involved in a forfeiture action. Well, my experience in criminal cases, at least, is that the government, they're going to forfeit assets, they take everything in sight. Okay, there you are. There you are. I'm looking to see if any of your earlier questions were something that I needed to discuss. Tellingham argued in the district court that he was entitled to a setoff of half of the 2.2 million in the CTI restoration account, and the district judge did not grant that request. On appeal, he wants everything that was seized from him by the Justice Department that was retained by the government, which he calculates to be about 4.3 million. This is a new argument, and it was not presented to the district court. Well, it's a new amount. He always said he wanted some of his money back. Some money. But the amount isn't based on the same thing at all. It's based on everything he seized. Well, let me tell you why I think that's a problem. He's not entitled to that money because it was distributed to investors in OTG under an agreement that he agreed to. And he knew that. I mean, you don't get back the funds that were seized from you if they are used properly by the Justice Department for a different claim. And I think he has a burden of proof to show that he does get a setoff. And with regard to those funds, he definitely has not carried it since those were distributed to others. The government does not have them. They are not retained. And he agreed to their disposition. His obligation to pay disgorgement in the commission's case doesn't go away because the seized funds were distributed to OTG in the OTG case. The obligation to pay disgorgement is a personal one. It doesn't have to be confined to the very things that you defrauded people of. But rather, you have to pay whatever the amount is from whatever funds you have. And as the commission stated in its brief, Cunningham will definitely get credit for any funds that were delivered to investors in CTI. Because those are claims that come from the disgorgement award. They're all CTI customers who have been defrauded. And he won't be required to give back the funds twice because the OTG funds and the CTI funds are absolutely different. The proper procedure, I think, for a set-off is certainly not to give a set-off now or early in the process, but when there is enough data from the investors to be able to determine their claims and losses accurately. And it's possible that that's the sort of thing that you do want to send back to the district court. Thank you, counsel. Your time has expired. Mr. Chaffee will restore one minute for rebuttal. Thank you, Your Honor. Very briefly, one, there's been a reference to 981 and 982, which is the basis of the U.S. government's first claim. In fact, Your Honor, that's not referenced in the settlement. And if it were to be a limitation, there wouldn't be any purpose for saying U.S. government and other agencies. Two, the argument that the SEC was unfamiliar with the agreement does not fly because of the declarations that are set forth in Volume 5 of the excerpt of record. Ms. Murphy and Mr. Siegel both talk about discussions. Second, in item 48, you see various letters between the SEC and others who are part of the Joint Task Force. And third, and finally third, Your Honor, the CTI was brought in not just as an afterthought, but by the district court itself. That's in the excerpt of record. And I believe my minute is up, Your Honor. Thank you very much. Thank you, counsel. We appreciate the arguments from both parties. The case just argued is submitted. And our final item on the docket this morning is Franklin v. State of California Youth Authority. And as counsel are coming up, we would remind you of the order to respect in your comments the protective order from the district court in your description of the facts of the case.
judges: Graber, Wardlaw, Rawlinson